## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | |
|---|---|
| Kimberly Childs, on behalf of herself and all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Hyphen, LLC d/b/a/ Helix Financial, and Lead Bank,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Kimberly Childs ("Plaintiff"), by and through her attorneys, on behalf of herself and the Classes set forth below, brings this Class Action Complaint against Hyphen, LLC d/b/a/ Helix Financial ("Helix" or "Helix Financial") and Lead Bank (collectively, "Defendants").

## I.    INTRODUCTION

1.      This is a class action seeking redress for consumers who were victims of an usurious "rent-a-bank" lending scheme.

2.      Since the advent of usury laws, lenders have tried to subvert and circumvent those laws through various schemes. As the Supreme Court recognized nearly 200 years ago, "[t]he ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the statute may be evaded." *Scott v. Lloyd*, 34 U.S. 418, 446, 9 L. Ed. 178 (1835).

3.      Thus, despite states' best efforts to reign in predatory lending via state usury

laws, many lenders have continued to concoct new schemes to evade such laws and to continue to issue short-term loans with astronomical interest rates. Such predatory loans are often referred to as "payday loans."

4.      This case involves one such clever—though, nonetheless unlawful—scheme, commonly called a "rent-a-bank" strategy.

5.      Through the Installment Loan Act, the Georgia General Assembly has long codified many restrictions on payday lending by, for example, requiring that lenders, unless expressly exempted, be licensed with the State and that they cap the annual interest on their loans at 10%. *See* Ga. Code Ann. §§ 7-3-4 (requiring licensure), 7-3-11(1) (setting maximum interest rate at 10% per year).

6.      But, through the rent-a-bank scheme, predatory lenders devised a work-around. As the Georgia Court of Appeals summarized: "In an attempt to circumvent state usury laws, some payday lenders have contracted with federally chartered banks or state chartered banks insured by the FDIC to take advantage of federal banking laws that allow such banks to make loans across state lines without regard to that state's interest and usury laws in 'rent-a-charter' or 'rent-a-bank' contracts." *USA Payday Cash Advance Centers v. Oxendine*, 262 Ga. App. 632, 634, 585 S.E.2d 924, 926–27 (2003).

7.      In other words, "[i]n a rent-a-bank arrangement, a nonbank contracts to buy loans that a bank has made for it on spec. The nonbank then claims to shelter in the bank's exemption from state usury laws and other consumer protection laws, as well as the benefit of the choice-of-law provisions applicable to the bank. And because the loan is not directly made by the nonbank, the nonbank claims that it is exempt from state licensure

requirements for nonbank lenders."[1]

8.      In direct response to the rise in the rent-a-bank strategy, in 2004, the Georgia General Assembly took action once again to further strengthen protections for Georgia borrowers.

9.      The purpose of the resulting law, the Payday Lending Act, Ga. Code Ann. § 16-17-1 *et seq* (the "PLA"), could not be any clearer. In passing the PLA, the General Assembly explained as follows:

> **The General Assembly has determined that various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions or to cause these transactions to appear to be "loans" made by a national or state bank chartered in another state in which this type of lending is unregulated**, even though the majority of the revenues in this lending method are paid to the payday lender. The General Assembly has further determined that payday lending, despite the illegality of such activity, continues to grow in the State of Georgia and is having an adverse effect upon military personnel, the elderly, the economically disadvantaged, and other citizens of the State of Georgia. The General Assembly has further determined that substantial criminal and civil penalties over and above those currently existing under state law are necessary in order **to prohibit this activity in the State of Georgia and to cause the cessation of this activity once and for all**.

Ga. Code Ann. § 16-17-1(c) (emphasis added).

10.      In other words, through the PLA, the Georgia General Assembly sought to put an end to payday lending and, in particular, rent-a-bank schemes, "once and for all." To achieve this goal, the General Assembly enacted sweeping and multi-pronged reforms.

11.      First, with only certain exceptions, the PLA altogether forbids payday

---

[1] Adam J. Levitin, *Rent-A-Bank: Bank Partnerships and the Evasion of Usury Laws*, 71 Duke L.J. 329, 333 (2021).

lending at an Annual Percentage Rate ("APR") that exceeds 16%. Ga. Code Ann. § 16-17-2(a).

12.     Taking matters further, the PLA expressly prohibits the rent-a-bank strategy, as the Act's ban on payday lending explicitly extends to loan transactions in which "a de facto lender purports to act as the agent for an exempt entity." Ga. Code Ann. § 16-17-2(b)(4). "A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan." *Id.*

13.     Further, the General Assembly directed that, when faced with an alleged rent-a-bank set-up, courts should look at the terms of transaction in their entirety, and keep an eye out for predatory lenders' maneuvers. Specifically, the PLA states that, when evaluating a loan transaction alleged to violate the PLA, "the trial court shall be authorized to review the terms of the transaction in their entirety in order to determine if there has been any contrivance, device, or scheme used by the lender in order to avoid the [PLA's prohibition on payday lending]." Ga. Code Ann. § 16-17-6.

14.     Despite the clarity of both the PLA's intent and statutory language, Helix has concocted yet another scheme to evade Georgia law.

15.     Specifically, Helix insists that it is merely a "brand" of a bank exempt from state usury laws—here, Lead Bank, a state-chartered, FDIC-backed bank headquartered in Missouri—not an "agent" thereof. Therefore, according to Helix, it is free to issue and collect loans to Georgia consumers with triple-digit interest rates, often exceeding 400%.

16.     However, a cursory examination of the true relationship between Helix and

Lead Bank, as well as between Helix and Georgia borrowers, demonstrate that Helix is the true lender. And, moreover, Helix has plainly employed a scheme, device, or contrivance— *i.e.*, its claim that it is a "brand" of its partner bank—in an attempt to evade Georgia's restrictions on payday lending.

17.     Therefore, despite its best efforts, Helix cannot escape the reach of the PLA. Nor can Helix and its partner, Lead Bank, collect unlawful debts through the "Helix by Lead Bank" brand they fabricated—which is a textbook "enterprise" under both Georgia and federal Racketeer Influenced and Corrupt Organizations ("RICO") laws.

18.     Plaintiff's case illustrates that Helix is the true lender behind many borrowers' usurious loans, and that Defendants also schemed to collect unlawful debts on such loans.

19.     In 2019, Plaintiff, a Georgia resident, applied for and received a $700 loan with an APR of a whopping **547%**. Although Plaintiff's loan paperwork was purportedly between her and Lead Bank, the bank's involvement was nothing more than a façade, and a temporary one at that.

20.     On its website, https://helixfi.com/ (the "Website"), Helix concedes that it is a lender, not simply a "brand"; further, it admits that it sets the application criteria, and makes lending decisions, for its loans. What's more, throughout her loan paperwork, Plaintiff was directed to contact Helix—not Lead Bank—with any questions related to her loan. In addition, the very number of Plaintiff's loan, which begins with the letters "HF," suggests that it was Helix Financial, not Lead Bank, that was behind the loan from the start. Finally, as soon as Plaintiff executed her loan with Lead Bank, the loan was *immediately*

transferred to Helix for servicing.

21.     Moreover, Lead Bank essentially admitted that it allowed Helix to use the bank as a front for issuing loans, stating in a 2021 press release that "[Lead Bank] has been an active partner for fintechs, **allowing them to use the bank's platform**."[2] In that same press release, Lead Bank names "Hyphen Funding" (i.e., Helix) as one such fintech "partner."[3]

22.     Under the entire circumstances of Plaintiff's transaction, discussed further herein, it is clear that Helix is the de facto lender. *See* Ga. Code Ann. § 16-17-2(b)(4). It is also clear that, for Plaintiff's transaction, Helix, along with its partner, Lead Bank, employed a contrivance, device, or scheme in an attempt to avoid the reach of the PLA. *See* Ga. Code Ann. § 16-17-(6).

23.     Clever as it may be, by acting as the true lender on payday loans with triple-digit interest rates, Helix has violated the PLA. And, through its scheme, it has also violated Georgia and federal RICO laws, as has its former partner, Lead Bank.

24.     Plaintiff, on behalf of herself and the Classes set forth below, seeks to recover damages (including treble damages), attorneys' fees and costs, and other relief.

## II.     THE PARTIES

25.     Individual and representative Plaintiff Kimberlee Childs is a natural person and resident of Albany, Georgia.

---

[2] https://web.archive.org/web/20230530071723/https://www.lead.bank/single-blog/news-press-releases/2021/04/08/lead-bank-partners-with-fintech-helping-veterans-with-closing-costs (emphasis added) (last visited Oct. 30, 2023).
[3] *Id.*

26.     Hyphen, LLC is a limited liability company incorporated in Kansas. According to Hyphen, the company is "the only true all-in-one, end-to-end digital lending platform available on the market."[4] As part of its business, Hyphen, LLC operates Helix Financial.

27.     Lead Bank is a state-chartered. FDIC-insured bank headquartered in Kansas City, Missouri.

## III.     JURISDICTION AND VENUE

28.     This Court has original jurisdiction over Plaintiff's federal RICO claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

29.     This Court also has jurisdiction under the Class Action Fairness Act because the amount in controversy—the aggregate amount sought by the Classes—exceeds $5 million, and Plaintiff is diverse from at least one Defendant.

30.     This Court has specific personal jurisdiction over Defendants because, at all times relevant herein, Defendants intentionally availed themselves of and purposefully directed their activities towards the State of Georgia by doing business here.

31.     Venue is proper in the Albany Division of the Middle District of Georgia because a substantial part of the events giving rise to the claim occurred here. When Plaintiff entered the loan at issue in this action, she lived in Albany, Georgia.

## IV.     FACTS

### A.  The Georgia General Assembly Has Enacted Numerous Laws to Protect

---

[4] https://www.hyphenfi.com/about-us/ (last visited October 30, 2023).

**Consumers from Predatory Lending, Including Rent-A-Bank Schemes**

### i.   General Restrictions on Predatory Loans

32.   The Georgia General Assembly codified many protections for consumers against predatory lenders via the Industrial Loan Act, Ga. Code Ann. § 7-3-1, *et seq.* (the "ILA"), the purpose of which is to "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (2012) (citation omitted).

33.   In 2020, the ILA was renamed the "Installment Loan Act," and was expanded to cover all loans of $3,000 or less, regardless of the interest rate. Ga. Code Ann. § 7-3-3(7).

34.   Unless expressly exempted by the terms of the ILA, a lender must obtain a license to make any such loans. Ga. Code Ann. § 7-3-4.

35.   And, on any loans, the licensed lender may not charge, contract for, receive, or collect interest at a rate more than 10% per year. Ga. Code Ann. § 7-3-11(1).

36.   Any contracts made in violation of the ILA "shall be null and void." Ga. Code Ann. § 7-3-50(c).

### ii.   Restrictions on Rent-A-Bank Schemes

37.   Unfortunately, the ILA and other usury protections for consumers proved ineffective, given the determination and ingenuity of predatory lenders. As described above, lenders developed the "rent-a-bank" strategy to skirt such laws.

38.   To summarize:

The basic design of a rent-a-bank transaction is straightforward. A nonbank lender contracts with a bank to make loans according to the nonbank lender's

specifications and then sells the loans to the nonbank lender. In a rent-a-bank transaction, the bank's role is likely limited to the initial funding of the loan and perhaps some servicing support, although the bank's name will be on the loan as the lender. The nonbank (or set of affiliated nonbank entities) will handle the other aspects of the loan: design, marketing, underwriting, servicing, and holding of all or most of the risk. The precise allocation of marketing and servicing duties is not critical to rent-a-bank structures. Instead, the key features are the bank taking its underwriting marching orders from the nonbank and the nonbank acquiring the lion's share of financial exposure on the loans.[5]

39.     In 2004, following the rise of rent-a-bank schemes, the Georgia General Assembly took action, explaining that "[it] ha[d] determined that payday lending continues in the State of Georgia and that there are not sufficient deterrents in the State of Georgia to cause this illegal activity to cease." Ga. Code Ann. § 16-17-1(c).

40.     The result—the comprehensive Payday Lending Act—was intended to end the business of usurious, small-dollar lending, which, as the General Assembly noted in its legislative findings, has "an adverse effect upon military personnel, the elderly, the economically disadvantaged and other citizens of the State of Georgia." *Id.*

41.     The PLA therefore makes it "unlawful for any person to engage in any business, in whatever form transacted, including, but not limited to, by mail, electronic means, the Internet, or telephonic means, which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less" at an APR that exceeds 16%, unless the lender is licensed to make such loans under the ILA or other laws regulating financial institutions. Ga. Code Ann. § 16-17-2.

---

[5] Levitin, *supra* n.1, at 359-60.

42.    The PLA bars a lender from collecting any indebtedness created by an unlawful loan, and declares the underlying transaction "void ab initio." Ga. Code Ann. § 16-17-3.

43.    When enacting the PLA, the Georgia General Assembly recognized the specific and growing risk of rent-a-bank schemes. *See* Ga. Code Ann. § 16-17-1(c).

44.    Accordingly, the General Assembly expressly instructed courts applying Section 16-17-2's prohibition on usurious, small-dollar lending to:

a)  disregard "[a]ny arrangement by which a de facto lender purports to act as the agent of an exempt entity" if "the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan, Ga. Code Ann. § 16-17-2(b)(4); *see also id.* at § 16-17-6) ("If any entity involved in soliciting or facilitating the making of payday loans purports to be acting as an agent of a bank or thrift, then the court shall be authorized to determine whether the entity claiming to act as agent is in fact the lender. Such entity shall be presumed to be the lender if, under the totality of the circumstances, it holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan."); and

b)  "review the terms of the transaction in their entirety in order to determine if there has been any contrivance, device, or scheme used by the lender in order to avoid" the PLA's prohibitions, and to "determine exactly whether the loan transaction includes the use of a scheme, device, or contrivance and whether in reality the loan is in violation of the provisions of [the PLA's prohibitions] based upon the facts and

evidence relating to that transaction and similar transactions being made in the State of Georgia." *Id.*

45.     Further, the General Assembly acknowledged that "[c]ertain payday lenders have attempted to use forum selection clauses contained in payday loan documents in order to avoid the courts of the State of Georgia" and "determined that such practices are unconscionable and should be prohibited." Ga. Code Ann. § 16-17-1(d). Therefore, under the PLA, "[a] payday lender shall not include in any loan contract made with a resident of this state any provision by which the laws of a state other than Georgia shall govern the terms and enforcement of the contract, nor shall the loan contract designate a court for the resolution of disputes concerning the contract other than a court of competent jurisdiction in and for the county in which the borrower resides or the loan office is located." Ga. Code Ann. § 16-17-2(c)(1).

46.     Moreover, the PLA declares that "[a]n arbitration clause in a payday loan contract shall not be enforceable if the contract is unconscionable." Ga. Code Ann. § 16-17-2(c)(2). *See also Davis v. Oasis Legal Fin. Operating Co., LLC*, 936 F.3d 1174, 1176–77 (11th Cir. 2019) ("Georgia's Payday Lending Act and Industrial Loan Act articulate a clear public policy against enforcing forum selection clauses in payday loan agreements and in favor of preserving class actions as a remedy for those aggrieved by predatory lenders. If Georgia's public policy regarding payday lenders is a horse, as Justice Burrough suggested, it carries these borrowers safely to a Georgia courthouse.").

**B.  In Clear Defiance of Georgia Law, Helix Has Devised a Rent-A-Bank Scheme Under Which It Has Issued Unlawful, Usurious Loans to Georgia Borrowers, Using at Least Three Different Banks, Including Lead Bank, As a Front**

47.     Despite the above statutory scheme, and the clear legislative intent behind it, Helix has brazenly issued, and thereafter collected interest on, plainly unlawful loans, which routinely have APRs of more than 400% or, in Plaintiff's case, even higher.

48.     Unable to lawfully issue such loans directly to consumers in many states, Helix devised a scheme under which it purports to be a "brand" of its bank partner, which, Helix claims, issues and services the loans. The reality, however, is that Helix is not a brand of the bank, but rather, it is a completely separate company who is responsible for all material aspects of these illegal transactions, *i.e.*, the lead generation, loan origination, servicing, and collection of the loans. In other words, the bank is a front for Helix.

49.     Indeed, across its Website, Helix repeatedly refers to itself as a "lender," and even concedes that Helix (not the bank) sets the application criteria, and approves consumers, for the loans. Moreover, as soon as the loans are issued by Helix's partner bank, the bank *immediately* informs borrowers that Helix is assuming all servicing responsibilities for the loan. In sum, and as illustrated by Plaintiff's story, the bank's brief involvement in each loan transaction is a mere façade to allow Helix to make blatantly unlawful loans to consumers. This is precisely the sort of rent-a-bank scheme that the Georgia General Assembly has declared unlawful.

50.     Today, using the above scheme, Helix issues loans in around 38 states, including Georgia.[6]

51.     As of February 2022, Helix advertised that its "[l]oan amounts range from $200 to $4,000 with a repayment term of up to 24 months."[7]

52.     At this time, Helix also stated that the APR on its loan ranged from 36% to **499%**.[8] However, in August 2020, Helix stated that the APR on its loans were as high as **799%**.[9]

53.     As discussed herein, when considering the entire circumstances of the loan transactions, and reviewing the terms of the loan transactions in their entirety, it is clear that Helix is the de facto lender on the loans issued by its partner banks (including Lead Bank), and that the so-called Helix "brand" is a contrivance, device, or scheme used by Helix to avoid Georgia law.

i.     **Over the years, Helix has jumped from bank to bank, bringing its usurious loan products with it**

54.     Helix has not "rented" just one bank. Instead, since 2019, Defendant has jumped around from bank to bank, using at least three different state-chartered, FDIC-backed banks—Lead Bank, Kendall Bank, and Bank of Orrick—as cover for its scheme.

55.     Lead Bank and Bank of Orrick are both located in Missouri, while Kendall Bank is located in Kansas.

---

[6] https://helixfi.com/lending-locations (last visited Oct. 30, 2023).
[7] https://web.archive.org/web/20220203173542/https://helixfi.com/ (last visited Oct. 30, 2023).
[8] *Id.* (emphasis added).
[9] https://web.archive.org/web/20200815184958/https://helixfi.com/ (emphasis added) (last visited Oct. 30, 2023).

56.     In at least 2019 and 2020, Helix partnered with Lead Bank. In 2020, on the Website, Helix referred to itself as "Helix by Lead Bank."[10]

57.     But by January 2021, Helix had switched to Kendall Bank; by March 2022, Helix referred to itself as "Helix by Kendall Bank," which it declared was "a brand of Kendall Bank."[11]

58.     By September 2022, Helix had switched yet again, this time to Bank of Orrick, the bank with which Helix still partners today.[12] Helix now refers to itself as "Helix by Bank of Orrick," which it declares is "a brand of Bank of Orrick."

59.     Remarkably, when jumping from bank to bank, the nuts and bolts of the so-called Helix "brand" have remained exactly the same: Helix's Website URL, phone number, email address, and even the customer reviews featured on the Website have remained exactly the same.

60.     As summarized below, the only apparent changes that Helix made when switching bank partners was to change the name of the "brand" and to slightly modify its logo.

| | Lead Bank | Kendall Bank | Bank of Orrick |
|---|---|---|---|
| **Name** | Helix by Lead Bank | Helix by Kendall Bank | Helix by Bank of Orrick |
| **Logo** |  |  |  |
| **Website** | Same[13] | Same | Same |

---

[10] https://web.archive.org/web/20201126113859/https://helixfi.com/ (last visited Oct. 30, 2023).
[11] https://web.archive.org/web/20220331051104/https://helixfi.com/ (last visited Oct. 30, 2023).
[12] https://web.archive.org/web/20220928171632/https://helixfi.com/ (last visited Oct. 30, 2023).
[13] The website for each "brand" is https://helixfi.com/.

| | | | |
|---|---|---|---|
| **Phone Number** | Same[14] | Same | Same |
| **Email Address** | Same[15] | Same | Same |
| **Customer reviews** | Same[16] | Same | Same |

61.     Despite the clever framing, "Helix" is not simply a brand of each of these banks. Rather, Helix is its own unique entity, that shops around its usurious loan products from willing bank to willing bank.

62.     As explained further below, under the totality of the circumstances, Helix is the true lender of the resulting loans.

**ii.     Helix admits that it sets application criteria for the loans, makes decisions about whether to extend credit to applicants, and enters contracts with borrowers**

63.     Helix readily admits that it—not its partner bank—sets the application criteria for the loans, decides whether to make loans to consumers, and thereafter enters loan agreements with borrowers.

64.     Although Helix has altered or altogether removed many references indicating its role in setting loan application criteria and making credit decisions, as of September 2020, Helix previously admitted, for example, the following:

---

[14] The phone number for each "brand" is 800.619.5309.
[15] The email address for each "brand is" info@helixfi.com.
[16] Over the years, and as Helix has moved from bank to bank, it has featured the exact same customer reviews from the following supposed consumers: Jesus and Juanita V.; Anthony D.; Laurie H.; Ladonna B.; Karen M.; and Constance B.

| Helix's Previous Admission | What the Website Says in 2023 |
|---|---|
| "**Helix Financial reviews your information** in real-time to determine whether your information meets **our lending criteria**."[17] | "Bank of Orrick reviews your information in real-time to determine whether your information meets its lending criteria."[18] |
| "Availability of installment loans are subject to change at any time at **the sole discretion of Helix Financial**."[19] | "Availability of loans are subject to change at any time at the sole discretion of Bank of Orrick."[20] |
| "Receive a decision instantly with **our automated loan approval engine**."[21] | "Receive a decision instantly and select the loan amount that works best for you."[22] |

65.     Despite having scrubbed many such references, to this day, Helix concedes across its Website that borrowers apply for loans with Helix (not Bank of Orrick) and that Helix (not Bank of Orrick) approves borrowers for their loans.

66.     For example, Helix currently states on its Website that: "If you need money rather quickly, and think an online lender would best fit your needs at this time, **fill out a personal loan application with Helix** today and see if you are approved." [23] In other words, borrowers apply for loans *with Helix*, not Bank of Orrick.

---

[17] https://secure.helixfi.com/login/ (emphasis added) (last visited Oct. 30, 2023).
[18] https://web.archive.org/web/20200923061438/https://secure.helixfi.com/login/ (emphasis added) (last visited Oct. 30, 2023).
[19] https://secure.helixfi.com/login/(emphasis added) (last visited Oct. 30, 2023).
[20] https://web.archive.org/web/20200923061438/https://secure.helixfi.com/login/ (emphasis added) (last visited Oct. 30, 2023).
[21] https://web.archive.org/web/20200922171043/https://helixfi.com/how-to-get-personal-loan (emphasis added) (last visited Oct. 30, 2023).
[22] https://web.archive.org/web/20230529183513/https://helixfi.com/how-to-get-personal-loan(emphasis added) (last visited Oct. 30, 2023).
[23] https://helixfi.com/blog/how-to-find-the-right-lender (emphasis added) (last visited Oct. 30, 2023).

67.     Helix further states that: "**We approve people for the maximum amount they can afford**, while giving them the opportunity to select a loan amount if they want to lower their payments."[24] That is, *Helix*, not Bank of Orrick, approves lenders.

68.     Relatedly, Helix advises potential borrowers that "**if your loan agreement is signed by 4 pm Central Time with Helix**, you'll receive your funds via ACH deposit to your account by the following business day."[25] In other words, borrowers enter a loan agreement *with Helix*, not Bank of Orrick.

69.     Taken together, these admissions—particularly when coupled with Helix's previous, and damning, statements—indicate that borrowers apply for Helix loans with Helix (not its bank partner), that it is Helix (not its partner bank) that sets application criteria and approves borrowers for loans, and that it is Helix (not its partner bank) that ultimately enters loan agreements with consumers. Thus, Helix is the de facto lender.

### iii.     <u>Helix admits that it is a lender, not just a "brand"</u>

70.     Moreover, Helix has made—and, in many instances, continues to make—admissions acknowledging that Helix itself is a lender.

71.     For example, Helix has previously stated as follows: "One of the things that **sets Helix apart from other lenders** is that we truly value and care about our customers."[26] Notably, Helix has since modified this language to say: "One of the things that sets **Helix by Bank of Orrick** apart from other lenders is that we truly value and care about our

---

[24] https://helixfi.com/blog/why-choose-helix-loans (emphasis added) (last visited Oct. 30, 2023).
[25] https://helixfi.com/blog/how-to-find-the-right-lender (emphasis added) (last visited Nov. 1, 2023).
[26] https://web.archive.org/web/20200815185225/https://helixfi.com/blog/why-choose-helix-loans (emphasis added) (last visited Oct. 30, 2023).

customers."[27] In other words, Helix has simply added the words "by bank of Orrick" to try to mask that Helix itself is the lender.

72.     While Helix has since removed from the Website many references to it being a lender, to this day, several such statements remain. For example, Helix currently declares as follows on the Website:

a) "**As a responsible lender**, we commit to you that this loan product abides by all applicable laws and that we strive for the utmost level of transparency and fairness."[28]

b) "**Unlike other lenders**, Helix does not charge a prepayment penalty for those who want to pay off their loan early."[29]

c) "If you're looking for money to hold you over and need it within the next 24 hrs, take a look at our online personal loans and **see if we would be the right lender for you**..."[30]

73.     In making such statements, Helix acknowledges, as it must, that it is much more than simply a "brand" of products, issued by a partner bank. It is, in fact, the lender.

**iv.     <u>Helix handles all customer inquiries and communications</u>**

74.     Another telling indication that Helix is the true lender is the fact that, even *before* loans are transferred to Helix for servicing, as discussed further below, Helix oversees all customer inquiries related to the loans.

---

[27] https://helixfi.com/blog/why-choose-helix-loans (emphasis added) (last visited Oct. 30, 2023).
[28] https://helixfi.com/responsible-lending-policy (emphasis added) (last visited Oct. 30, 2023).
[29] https://helixfi.com/blog/how-to-find-the-right-lender (emphasis added) (last visited Oct. 30, 2023).
[30] https://helixfi.com/blog/alternatives-to-payday-loans (emphasis added) (last visited Oct. 30, 2023).

75.     Throughout the Website and across customer agreements, all consumer inquiries are directed to *Helix*, not its partner bank. "Still have questions about Helix personal loans?"[31] Helix asks. "Contact one of our friendly loan advisors today," Helix continues, going on to provide Helix's phone number (800.619.5309) and email address (info@helixfi.com)—not the contact information for its current partner, Bank of Orrick.[32]

76.     And, this same phone number and email address were provided repeatedly in Plaintiff's "Consumer Installment Loan Agreement" (the "Agreement," attached hereto as Ex. A). For example, to cancel her loan or to discuss "other payment methods that may be available," Plaintiff was directed to call or email *Helix*, not Lead Bank, the bank that purportedly issued and serviced her loan. *Id.* at 3-4.

**v.     Helix is responsible for borrower acquisitions**

77.     Helix also manages borrower acquisition, further indicating that Helix is the true lender of its usurious loans.

78.     Helix manages the Website—which has remained constant as Helix has jumped from bank to bank—through with customers apply for the loans.

79.     Remarkably, Helix's current bank partner, Bank of Orrick, makes *no mention anywhere* on its website about its supposed Helix "brand" and loan products. On Bank of Orrick's website page titled "Personal Banking: Loan Products," Helix is not mentioned even once.[33]

---

[31] https://helixfi.com/ (last visited Oct. 30, 2023).
[32] *Id.*
[33] https://bankoforrick.com/personal-banking/loans/ (last visited Oct. 30, 2023).

80.     And, for consumers seeking "more information" about Bank of Orrick's loan products, they are directed to "contact Jennifer Enloe at jennifer@bankoforrick.com, call 816.770.3311, or visit [Bank of Orrick] at the bank."[34] That is, they are not directed to contact the email address or phone number provided on the Website that is supposedly a "brand" of Bank of Orrick.

81.     Likewise, at around the time Plaintiff applied for her loan, Lead Bank did not mention its supposed Helix "brand" anywhere on the "Lending solutions" or "Personal Loan" pages of its website.[35]

82.     Accordingly, consumers who take out loans from Helix find, and apply for, Helix's loan products through *Helix*, not whatever bank of which Helix purports to be a "brand" at the time.

### vi.     In sum, Helix holds the predominant interest in the revenues generated by the loans

83.     Finally, after borrowers are assured that "[l]oans are issued and serviced" by the partner bank,[36] and after they complete their loan paperwork, they *immediately* receive a notice announcing that it is in fact *Helix* that manages the servicing for the loan.

84.     The entire circumstances of the loan transactions show that Helix is the true issuer and servicer of the loan, and that it holds, acquires, or maintains a predominant economic interest in the revenues generated by the loans.

---

[34] *Id.*
[35] https://web.archive.org/web/20190814171326/https://www.lead.bank/personal/lending-solutions (last visited Nov. 1, 2023); https://web.archive.org/web/20190814164124/https://www.lead.bank/personal/lending-solutions/personal-loans (last visited Nov. 1, 2023).
[36] https://secure.helixfi.com/login/ (last visited Nov. 1, 2023).

85.    Moreover, the notion that Helix is merely a "brand" of the bank is a contrivance, device, or scheme used by Helix in order to avoid the reach of the PLA.

**C. Using Lead Bank as a Front, Helix Issued Plaintiff a $700 Loan with a 547.4848% APR**

86.    On or around December 9, 2019, Plaintiff, a Georgia resident, was seeking a loan over the internet to help her pay for unexpected medical bills.

87.    At this time, she was solicited to apply for a loan with Helix via an advertisement.

88.    When she applied for a loan with Helix, she provided her address in Georgia. Ex. A at 2.

89.    On or around December 19, 2019, Plaintiff entered the Agreement for a $700 loan. *Id.*

90.    Per the Agreement, the loan's APR is **547.4848%** which is more than **34 times** the legal limit provided under the PLA. *Id.*

91.    Under the terms of the Agreement, Plaintiff was required to pay $2,679.74 in interest on the $700 loan. *Id.*

92.    Between December 13, 2019 and July 20, 2020, Plaintiff paid no less than $2,312.62 on the loan.

93.    The Agreement identifies "Lead Bank" as the lender, however, there are numerous indicia that Helix, not Lead Bank, is the true lender.

94.    In the contact information provided for Lead Bank, the Agreement lists not the phone number and address of Lead Bank, but, rather, the phone number and email address of *Helix*. *Id.*

```
Application Date: 12/09/2019
Effective Date: 12/09/2019

Lead Bank
9019 S 7 Highway
Lee's Summit, MO 64064
Phone: 800-619-5309
Email: info@helixfi.com
```

95.    In fact, throughout the Agreement, Plaintiff was directed to call *Helix's* phone number, and/or email *Helix's* email address, in order to take numerous actions related to her loan, including canceling the loan, discussing available payment options, discussing disputes related to the Agreement, and revoking authorization for processing deposits. *Id.* at 3-5, 11.

96.    Moreover, the "Loan No." listed in the Agreement begins with the letters "HF"—no doubt for "Helix Financial." *Id.*

97.    Finally, immediately upon executing the Agreement, Plaintiff received the following "SERVICING NOTICE":

Dear Borrower:

Effective immediately, please note that Helix Financial manages the servicing for Lead Bank. This includes: account maintenance, account history, account inquires, and payment processing and collecting.

You can contact Helix Financial with any questions about your account by logging on securely at helixfi.com or by calling Customer Service at 1-800-619-5309.

For any questions regarding this notice, please contact Lead Bank at (816) 220-8600.

Thank you.

*Id.* at 13.

98.   Plaintiff's experience is not unique. Helix, with the help of its partner banks, lulled countless borrowers into believing that they were applying for and receiving legitimate, lawful loans, only to learn that Helix was the de facto, and predatory, lender lurking in the shadows. Helix's conduct is plainly governed by, and unlawful under, the PLA. And, moreover, Helix's scheme with its partner banks—to contend that Helix is a "brand" of each bank—violates both Georgia and federal RICO laws. Accordingly, Plaintiff, on behalf of herself and the Classes set forth below, seeks to recover damages, attorneys' fees and costs, and other appropriate relief for Defendants' unlawful conduct.

## V.   CLASS ACTION ALLEGATIONS

99.   Plaintiff asserts her claims individually and on behalf of the proposed Class defined as follow:

> All individuals from Georgia: (1) who entered into a loan agreement with Helix; (2) where the APR imposed by the loan agreement exceeded 16%.

100.   Excluded from the Classes are Defendants' officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

101.   The action is certifiable as a class action under Fed. R. Civ. P. 23(a).

102.   <u>Numerosity</u>: At this time, Plaintiff does not know the exact number of members of the Classes; however, given the volume of Defendants' business, there are likely thousands of members of each Class. Thus, the Classes are so numerous that joinder of all members is impracticable.

103.   <u>Commonality</u>: There are numerous common questions of law and fact common to Plaintiff and members of the Classes. These questions include, but are not limited to, the following:

    a)  Whether Helix violated Georgia state usury laws;

    b)  Whether Defendants constitute an "enterprise" under RICO;

    c)   Whether Defendants violated RICO by charging interest rates more than twice the legal limit under state law; and

    d)  The proper measure and amount of damages for the Classes.

104.   <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Classes she seeks to represent. Plaintiff, like members of the Classes, took out a usurious loan from Helix, through the guise of Lead Bank. Thus, Plaintiff's claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

105.   <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has competent and capable attorneys who are experienced litigators with significant experience litigating complex class actions, including those involving rent-a-bank scheme. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor

their counsel have interests that conflict with the Classes.

106.   <u>Predominancy and Superiority</u>. The Classes also meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

    a)  Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed;

    b)  It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

    c)  A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense;

    d)  The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

    e)  Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

107.   <u>Injunctive Relief</u>. Finally, the Class meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have

acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. More specifically, Plaintiff seeks declaratory relief that all loans made to the Class are void and unenforceable under Georgia law. Plaintiff further seeks an order enjoining Defendants from taking any action to collect on these loans. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Georgia Usury Laws
### (Asserted on Behalf of Plaintiff and the Georgia Class Against Helix)

108.   Plaintiff incorporates by reference the preceding paragraphs by reference as if specifically stated herein.

109.   Georgia law applies to the subject loans of Plaintiff and Georgia Class members. *See W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348, 793 S.E.2d 357, 366 (2016).

110.   In their loans to Georgia consumers, Helix charged and collected interest at a rate greater than the maximum legal rate of interest allowed under Georgia's Installment Loan Act or Payday Lending Act.

111.   Helix made such loans to Georgia consumers, despite not being licensed to make loans in the State of Georgia, thereby further violating the Installment Loan Act.

112.   Moreover, Helix violated the Payday Loan Act by issuing unlawful loans,

for which entire circumstances of the loan transactions show that Helix is the de facto lender.

113.   In addition, Helix has used contrivances, devices, or schemes in order to avoid the provisions of the PLA.

114.   Helix's loan transactions with Georgia consumers are accordingly unlawful and void, and Helix is barred from the collection of any indebtedness created by said transactions.

115.   Plaintiff and the Georgia Class are entitled to recovery of all principal and interest paid to the Defendants under the terms of the illegal loans and award damages equal to three times the amount of any interest paid by the borrowers arising out Helix's loan transactions. Plaintiff and the Georgia Class are entitled to further seek the recovery of attorneys' fees and costs.

## COUNT II
### Violation of RICO, 18 U.S.C. §§ 1962(c)
### (On Behalf of Plaintiff and the RICO Class Against All Defendants)

116.   Plaintiff incorporates by reference the preceding paragraphs by reference as if specifically stated herein.

117.   Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1961(3).

118.   Defendants, and the unnamed officers, executives, and other employees of Defendants, are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender

"Helix by Lead Bank" (herein, the "Enterprise").

119.    The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

120.    Defendants violated 18 U.S.C. § 1962(c) by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

121.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

122.    All of the loans made to Plaintiff and RICO Class members and collected by Defendants included an interest rate far in excess of twice the enforceable rate in their states.

123.    Plaintiff and RICO Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

124.    Defendants' unlawful conduct began in or around 2019, and Helix continues to engage in unlawful lending.

125.    Plaintiff and RICO Class members are entitled to their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III
### Violation of RICO, 18 U.S.C. §§ 1962(d)
### (On Behalf of Plaintiff and the RICO Class Against All Defendants)

126.    Plaintiff incorporates by reference the preceding paragraphs by reference as if specifically stated herein.

127.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1961(3).

128.    Defendants, and the unnamed officers, executives, and other employees of Defendants, are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender "Helix by Lead Bank" (herein, the "Enterprise").

129.    The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

130.    Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

131.    Plaintiff and RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

132.    Defendants' unlawful conduct began in or around 2019, and Helix's unlawful lending is continuing.

133.    Plaintiff and RICO Class members are entitled to their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

<u>COUNT IV</u>
**Violations of Georgia RICO**
**(Asserted on Behalf of Plaintiff and the Georgia Class Against all Defendants)**

134.    Plaintiff incorporates by reference the preceding paragraphs by reference as if specifically stated herein.

135.    Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Ga. Code Ann. § 16-14-4(a).

136.    Violations of the PLA are predicate acts and racketeering activity. Defendants have engaged in a pattern of racketeering activity by their violation of the PLA.

137.    Conspiracy and/or endeavoring to violate the substantive provisions of Georgia's RICO Act is a separate violation of the statute. Ga. Code Ann. § 16-14-4(c).

138.    For the same reasons set forth in Plaintiff's federal RICO causes of action herein, Defendants constitute an "enterprise" under Georgia's RICO law.

139.    Through their conduct, Defendants have violated and/or conspired to violate Georgia's RICO law.

140.    Plaintiff and the Georgia Class are entitled to appropriate injunctive relief, treble damages, punitive damages, attorneys' fees, and costs. Ga. Code. Ann. § 16-14-6.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, on behalf of herself and the Classes, prays for relief as follows:

a) An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

b) An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

c) An Order declaring that Defendants have committed the violations of law alleged herein and declaring the loans void and unenforceable;

d) An Order providing for any and all injunctive relief the Court deems appropriate, including an injunction prohibiting Defendants from taking any action to collect or enforce the loans;

e) An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

f) An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

g) An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

h) An Order awarding Plaintiff her reasonable costs and expenses of suit, including attorneys' fees; and

i) Such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Dated: November 15, 2023                    Respectfully submitted,

/s Charles E. Cox, Jr.
**Charles E. Cox, Jr., LLC**
Ga. Bar No. 192305
Post Office Box 67
Macon, Georgia 31202-0067
Telephone:     (478) 757-2990
Facsimile:     (478) 757-2991
E-mail:Charles@cecoxjr.com

Kristi Cahoon Kelly (*pro hac* forthcoming)
Andrew J. Guzzo (*pro hac* forthcoming)
**KELLY GUZZO, PLC**
3925 Chain Bridge, Suite 202
Fairfax, VA  22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

E. Michelle Drake, GA Bar No. 229202
John G. Albanese*
Ariana B. Kiener*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
emdrake@bm.net
jalbanese@bm.net
akiener@bm.net
*pro hac vice* forthcoming

*Attorneys for Plaintiff*
*And the Proposed Class*